FEB 26 2026 AM11:23
FILED - USDC - FLMD - JAX

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JANE DOE (H.S.M.), AN INDIVIDUAL,

Plaintiff,

v.

AMPN HOSPITALITY LLC,

Defendant.

CIVIL ACTION NO.

3:26-CV-414-TJC-LLL

JURY TRIAL DEMANDED

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jane Doe (H.S.M.) files this Original Complaint against Defendant AMPN Hospitality LLC, and respectfully shows the Court as follows:

## SUMMARY

1.      Jane Doe (H.S.M.) is a vulnerable victim of sex trafficking, an adult with a legally recognized mental disability and diminished cognitive functioning. She files this civil lawsuit seeking compensation for the harm she suffered because of the sex trafficking she endured at a hotel owned, operated, maintained, and controlled by Defendant and its employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

---

[1] 18 U.S.C. § 1591; 22 U.S.C. § 7102.

1

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[2] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control, including adults with cognitive or other mental disabilities like Jane Doe (H.S.M.).[3]

4.      Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[4] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[5]

5.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

6.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), codified in 18 U.S.C. §§ 1581–1597, including 18 U.S.C. § 1595, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

---

[2] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[3] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[4] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[5] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

7.     In 2008, Congress intentionally expanded the scope of the TVPRA to reach those who – while not criminally liable under the TVPRA – financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

8.     As a separate and additional remedy for those exploited as children, in 18 U.S.C. § 2255, Congress authorized any person who, while a minor, was a victim of a violation of 18 U.S.C. § 1591, to sue in any appropriate district court to recover damages. Although Jane Doe (H.S.M.) was not a minor at the time of her trafficking, the TVPRA's broader civil remedy under 18 U.S.C. § 1595 applies to adult victims like her.

9.     Jane Doe (H.S.M.) alleges that Defendant derived financial benefit from facilitating sex trafficking by providing a venue where traffickers could exploit vulnerable victims, including Jane Doe (H.S.M.), with minimal risk of detection or interruption. Jane Doe (H.S.M.) further alleges that Defendant enabled traffickers, including her own traffickers, despite obvious and apparent signs of sex trafficking in this hotel. Defendant was, therefore, knowingly receiving a benefit from participation in a venture that Defendant knew or should have known was engaged in sex trafficking.

10.     Defendant had the opportunity to prevent the severe and permanent harm that Jane Doe (H.S.M.) experienced as the result of continuous trafficking. Defendant failed to do so. Instead, Defendant recklessly and/or negligently facilitated her sex trafficking. Accordingly, Jane Doe (H.S.M.) files this lawsuit.

## PARTIES

11.     Plaintiff, Jane Doe (H.S.M.), is a resident of Florida. She may be contacted through her lead counsel, whose information is contained below.

3

12.     Jane Doe (H.S.M.) is a victim of sex trafficking under 18 U.S.C. § 1591(a) because she was provided for the purpose of being caused, through force, fraud, or coercion, to commit a commercial sex act.

13.     The trafficking of Jane Doe (H.S.M.) occurred in or affected interstate commerce.

14.     Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of Jane Doe (H.S.M.).

15.     Defendant AMPN Hospitality LLC is a Florida limited liability company with its principal place of business in Florida. Defendant may be served through its registered agent for process, Pragnesh Shah at 8555 Blanding Blvd, Jacksonville, Florida 32244. At all relevant times, Defendant AMPN Hospitality LLC owned, operated, controlled, and managed the Baymont Inn & Suites located at 8555 Blanding Blvd, Jacksonville, Florida 32244 ("Subject Hotel").

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## STATEMENT OF FACTS

**I.     Jane Doe (H.S.M.) is a Vulnerable Victim and Survivor of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendant.**

18.     Jane Doe (H.S.M.) is a woman with a legally recognized mental disability. Because of her disability and functional limitations, she was particularly susceptible to coercion and control. On February 9, 2017, she was reported missing by her mother after her school informed the family that Jane Doe (H.S.M.) had missed her special-needs class. On February 28, 2017, her traffickers took her to Room 230 of the Baymont Inn & Suites located at 8555 Blanding Blvd, Jacksonville,

4

Florida 32244 (the "Subject Hotel"). For the next twenty-one (21) days, Jane Doe (H.S.M.) was beaten, raped, and forced to engage in commercial sex acts for her traffickers' financial benefit. On March 21, 2017, Jane Doe (H.S.M.) was rescued by the Jacksonville Sheriff's Office. Her traffickers were arrested and later convicted and adjudicated guilty of felonies arising from their unlawful trafficking of Jane Doe (H.S.M.).

19.     Between February 28, 2017 and March 21, 2017, Jane Doe (H.S.M.) was sexually trafficked at the Subject Hotel. During this period, she was trafficked through force, fraud, and was required to engage in numerous commercial sex acts for her traffickers' financial benefit.

20.     Throughout her confinement at the Subject Hotel between February 28, 2017 and March 21, 2017, Jane Doe (H.S.M.), whose cognitive functioning was comparable to that of a minor child's, was beaten on a daily basis and raped by strangers at least twice per day.

21.     Jane Doe (H.S.M.) did not want to engage in commercial sex acts but felt she had no choice but to comply with her trafficker's demands.

22.     Jane Doe (H.S.M.)'s sexual exploitation occurred in rooms of the Subject Hotel and was facilitated by Defendant. At the Subject Hotel, she was harbored, maintained, provided, and solicited, and was caused to engage in commercial sex acts.

23.     Jane Doe (H.S.M.) was not allowed to keep any of the money generated by the commercial sex acts she was forced to perform.

24.     At all relevant times, Defendant owned, operated, and managed the Subject Hotel and employed the staff who worked at the Subject Hotel.

25.     There were obvious signs that Jane Doe (H.S.M.) was being trafficked at the Subject Hotel such that Defendant knew, or through the exercise of reasonable diligence should have known, that it was participating and benefiting in a venture causing her sexual exploitation.

5

26.     Some of the obvious signs of Jane Doe (H.S.M.)'s trafficking at the Subject Hotel included, among other things: that Room 230, where she was trafficked for twenty-one (21) days, was paid for in cash; that she did not leave the room alone and was always accompanied by an older man; that she had few or no personal belongings; that the "do not disturb" sign remained on the door of Room 230; that housekeeping was repeatedly refused; and that there was heavy, short-stay foot traffic by men to and from Room 230 over the twenty-one (21) day period.

27.     The arrest report following Jane Doe (H.S.M.)'s rescue confirms these red flags: "The manager of the hotel stated that he had seen the victim in the room for the past 21 days. He stated that room 230 was the room that they were staying in… The night manager advised the victim never left the room alone and was always accompanied by a black male… The room was paid in cash until 3/20/17."

## II.     The Hotel Industry's Role in Sex Trafficking and Defendant's Knowledge of the Problem.

28.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendant knew or should have known regarding the trafficking of Jane Doe (H.S.M.) at the Subject Hotel.

29.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6] For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[7] In 2014, 92 percent of calls to the Human

---

[6] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking-usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[7] *See* Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

Trafficking Hotline involved reports of sex trafficking taking place at hotels.[8] Hotels have been found to account for over 90 percent of places where commercial exploitation of children happens most often.[9]

30.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendant, on best practices for identifying and responding to sex trafficking.[10]

31.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and ECPAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[11]

32.     Widely recognized signs of sex trafficking, which can be observed by hotel staff and which Defendant was made aware of, include but are not limited to:

        a.  Individuals showing signs of fear, anxiety, tension, submission, and/or nervousness;

---

[8] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[9] Erika R. George & Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery*, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[10] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[11] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

b. Individuals showing signs of physical abuse, restraint, and/or confinement;

c. Individuals exhibiting evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

d. Individuals showing signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

e. Individuals lacking freedom of movement or are constantly monitored;

f. Individuals avoiding eye contact and interaction with others;

g. Individuals having no control over or possession of money or ID;

h. Individuals dressing inappropriately for their age or have lower quality clothing compared to others in their party;

i. Individuals having few or no personal items—such as no luggage or other bags;

j. Individuals appearing to be with a significantly older "boyfriend" or in the company of older males;

k. A group of girls appearing to be traveling with an older female or male;

l. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

m. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

n. Possession of bulk sexual paraphernalia such as condoms or lubricant;

o. Possession or use of multiple cell phones; and

p. Possession or use of large amounts of cash or pre-paid cards.[12]

33.    The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex

---

[12] *Id.*

trafficking.[13] From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

34.    Defendant was aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of that hotel.

35.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[14] It is also well understood, and specifically trained in hotel safety training courses, that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

36.    The definition of sex trafficking in the TVPRA under 18 U.S.C. § 1591(a)(1) incorporates the definition of commercial sex act. Defendant understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendant knew or should have known that signs of commercial sex (prostitution) activity in its hotel were in fact signs of sex trafficking.[15]

37.    Defendant was aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing

---

[13] Department of Homeland Security, *Blue Campaign Toolkit*, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[14] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.
[15] *Id.*

policies and procedures applicable to the Subject Hotel, and when training, educating, and supervising the staff of the Subject Hotel.

38.    The most effective weapon against sexual exploitation and human trafficking is education and training.[16] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[17]

39.    This conclusion is echoed by others who seek to eliminate or minimize sex trafficking in the hospitality industry, including the American Hotel & Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[18] In reference to companies like Defendant, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

40.    Given the prevalence of human trafficking in hotels and the abundance of information about how owners, operators, and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking is a conscious decision to financially benefit by facilitating unlawful sex trafficking.

---

[16] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[17] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Caroline L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[18] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

41.     Defendant has failed, at all levels, to take appropriate action in response to its knowledge regarding human trafficking at the Subject Hotel. Instead, Defendant has continued financially benefiting from providing a venue for the sexual exploitation of victims like Jane Doe (H.S.M.).

**III.     Sex Trafficking Has Long Been Prevalent at the Subject Hotel.**

42.     Defendant's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Defendant has also known, or should have known, since well before Jane Doe (H.S.M.) was trafficked at the Subject Hotel, that sex trafficking was ongoing and widespread at the Subject Hotel.

**A.     Sex Trafficking at the Subject Hotel was Well Known by Defendant.**

43.     Upon information and belief, Defendant monitored criminal activity occurring at the Subject Hotel and was aware of activity indicating commercial sex, sex trafficking, or related crimes occurring at the Subject Hotel.

44.     Defendant knew of the sex trafficking crisis prevalent in the hotel industry generally, as well as specifically at the Subject Hotel.

45.     Despite the continually mounting evidence that sex trafficking at the Subject Hotel was ongoing and growing, Defendant did not change course. Defendant chose to continue earning revenue and profits from renting out space in the hotel as a venue for trafficking.

46.     Defendant also knew or should have known that sex trafficking was prevalent at the Subject Hotel.

47.     Defendant knew that the Subject Hotel was in a high-crime area with a known history of sex trafficking.

48.    Online reviews of the Subject Hotel, which upon information and belief were monitored by Defendant, establish the nature of the Subject Hotel's role as a venue for criminal activity, including sex trafficking:

a.  A 2016 TripAdvisor review of the Subject Hotel states: "Had the misfortune of having to stay here one night after my reservation for a nearby hotel was not honored (overbooked). First, it is not a hotel, it is a motel. Here's the lowlights...many interesting characters hanging out in the parking lot at all hours of the night (coming and going)...several knocks on my door by some of these interesting characters 'looking for someone…'"[19]

b.  A 2016 TripAdvisor review of the Subject Hotel states: "Place is dirty...needs to be shut down..management doesn't do anything to help the property. The front desk staff is lazy. Night auditor has a chair out front won't get up to help you. Has papers on doors ..telling you the price..again what in the world. Front desk manager should be fired. There is tons of drug dealers..prostutes..again people fighting..they have a security officer but umm that's a joke. DON'T STAY HERE!!! IT'S NOT SAFE!!"[20]

c.  A 2016 TripAdvisor review of the Subject Hotel states: "After traveling a long time I arrived and the room was filthy. Of course I could a looked for another place. I am a clean freak so I went to work for an hour disinfecting and cleaning entire room until I was somewhat satisfied. The bed skirt had dried bodily fluids staining it in quite a few places. The sink was backed up with flies coming out of the drain when the water finally went down. The shower curtain was stained with mildew. They run prostitutes out of the rooms and I was approached on numerous occasions by individuals seeing if I was interested in purchasing drugs. The place is poorly managed as the GM's snooty attitude clearly indicated that she had no idea what the words quality, cleanliness, customer satisfaction and lets not forget professionalism mean. I give this place a few months before they are either shut down by county for many violations. I grade this place a D. If u are with family especially children traveling this would not be the place for you. If you are a street bumb, druggie, dealer, hooker or pimp this will be your paradise. Good Luck Yall"[21]

d.  A 2018 TripAdvisor review of the Subject Hotel states: "A run down dump with Drug addicts and Prostitutes and drunks all over the parking lot. Will never be back."[22]

---

[19] https://www.tripadvisor.com/ShowUserReviews-g60805-d88440-r355006139-Baymont_by_Wyndham_Jacksonville_Orange_Park-Jacksonville_Florida.html
[20] https://www.tripadvisor.com/ShowUserReviews-g60805-d88440-r362436702-Baymont_by_Wyndham_Jacksonville_Orange_Park-Jacksonville_Florida.html
[21] https://www.tripadvisor.com/ShowUserReviews-g60805-d88440-r366586143-Baymont_by_Wyndham_Jacksonville_Orange_Park-Jacksonville_Florida.html
[22] https://www.tripadvisor.com/ShowUserReviews-g60805-d88440-r564618215-Baymont_by_Wyndham_Jacksonville_Orange_Park-Jacksonville_Florida.html

> e. A 2021 TripAdvisor review of the Subject Hotel states: "this was the dirtiest hotel with the rudest employees . the entire place was filled up with dope heads running back and fourth from here to the super 8 next door. a man was shooting dope in the parking lot. several prostitutes' going in and out …"[23]
>
> f. A 2021 TripAdvisor review of the Subject Hotel states: "This was the 3rd time I had stayed here in the past few years and it will be the last. The primary reason is safety and security. They need to hire a full time Security Guard but it seems they have given up. A lot of the issues seem to come from a motel next door but it also seems to have spilled over into this property. There is a lot of what I would term illegal activity going on around the parking lot and on the premises. I would advise anyone with children or elderly to stay away. I call it like it is and people need to know the severity of it."[24]

49.    Traffickers, including Jane Doe (H.S.M.)'s traffickers, repeatedly chose to use the Subject Hotel for their sex trafficking activity. As such, Defendant also knew or should have known about the pervasive sex trafficking at the Subject Hotel based on obvious indicators of this activity.

**B. Defendant Knew Jane Doe (H.S.M.) was Being Trafficked at the Subject Hotel Because of the Apparent and Obvious "Red Flags" of Sex Trafficking.**

50.    During the period that Jane Doe (H.S.M.) was trafficked at the Subject Hotel, it was apparent she was the victim of sex trafficking.

51.    Because it was known among the community of traffickers that staff at the Subject Hotel turned a blind eye to sex trafficking, Jane Doe (H.S.M.)'s trafficker made little or no effort to disguise his role or his actions.

52.    At the Subject Hotel, Jane Doe (H.S.M.) exhibited numerous obvious signs of trafficking, including:

> a. The hotel room in which she was trafficked was paid for with cash;
>
> b. Housekeeping being kept out of the room for regular cleaning, towel exchange and other standard room services, with a "Do Not Disturb" sign posted at all times;

---

[23] https://www.tripadvisor.com/ShowUserReviews-g60805-d88440-r796996723-Baymont_by_Wyndham_Jacksonville_Orange_Park-Jacksonville_Florida.html
[24] https://www.tripadvisor.com/ShowUserReviews-g60805-d88440-r796827344-Baymont_by_Wyndham_Jacksonville_Orange_Park-Jacksonville_Florida.html

    c.   The constant presence of illicit drugs;

    d.   The traffickers lingering on the premises or in the parking lot while Jane Doe (H.S.M.) was forced to meet with sex buyers;

    e.   Heavy, short-stay foot traffic in and out of Jane Doe (H.S.M.)'s room involving men who were not hotel guests;

    f.   Jane Doe (H.S.M.) was never allowed to leave the room alone; and

    g.   Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

53.    Upon information and belief, multiple employees of the Subject Hotel – including management-level personnel – observed and were made aware of these signs of trafficking while acting within the course and scope of their employment for Defendant, as confirmed by statements recorded by the Jacksonville Sheriff's Office.

54.    Given these obvious signs, Defendant knew or should have known about the trafficking of Jane Doe (H.S.M.) at the Subject Hotel based on its policy or protocol that required hotel staff to report suspected criminal activity, including sex trafficking.

## IV.    Defendant Could Have Stopped Jane Doe (H.S.M.)'s Trafficking But, Instead, Facilitated It.

55.    Defendant is responsible for the acts and omissions of all employees of the Subject Hotel because these acts and omissions were committed in the course and scope of employment and because Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the risks, known to it, of human trafficking.

56.    Defendant, including through the staff at the Subject Hotel, had an opportunity to and did observe the signs of widespread sex trafficking in the Subject Hotel and, despite this, allowed this activity to continue unabated.

57.    Defendant, including through the staff at the Subject Hotel, had an opportunity to and did observe obvious signs that Jane Doe (H.S.M.) was being sex trafficked such that Defendant knew or should have known that Jane Doe (H.S.M.) was being sex trafficked at the Subject Hotel. Nonetheless, Defendant took no steps in response to these signs.

58.    Defendant facilitated Jane Doe (H.S.M.)'s trafficking at the Subject Hotel through numerous acts and omissions, including:

    a.  Adopting and enforcing training methods for hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

    b.  Adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

    c.  Adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of hotel staff related to human trafficking;

    d.  Enabling traffickers to access ancillary services that supported trafficking activities, such furnishing an unusually large number of sheets and towels to facilitate the commercial sex acts and providing disproportionate housekeeping services necessary to clean up the paraphernalia left after the transactions related to commercial sex;

    e.  Providing the free Wi-Fi that Jane Doe (H.S.M.)'s trafficker used to advertise and solicit buyers to purchase commercial sex delivered by Jane Doe (H.S.M.) at the hotel property;

    f.  Despite mining and monetizing customer data for marketing and other purposes, Defendant further refused to expend the necessary resources to effectively educate its staff and/or implement and enforce anti-trafficking measures and reporting; and

    g.  Implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their identities and activities but, instead, could operate without concern for detection or interference by the hotel staff.

59.    By ignoring or remaining willfully blind to obvious signs of trafficking, Defendant provided traffickers a venue, with the cover of a legitimate business, where they could conduct

their trafficking activities without having to expend significant efforts to avoid detection or interference.

**V.    Defendant Retained Control Over Relevant Aspects of Operations at the Subject Hotel and Thus Had Both the Opportunity and Duty to Prevent Sex Trafficking at the Subject Hotel, including Jane Doe (H.S.M.)'s Trafficking.**

60.    Defendant retained control over the details and methods of aspects of the operation of the Subject Hotel that are directly relevant to the proliferation of sex trafficking at that property. As a result of this retained control and its direct involvement, Defendant participated in a venture with sex traffickers who were using the Subject Hotel as a venue for their trafficking. Moreover, as a result of this retained control, Defendant had both the opportunity and the duty to prevent Jane Doe (H.S.M.)'s trafficking at the Subject Hotel.

61.    Defendant retained control over the training of the staff of the Subject Hotel regarding human trafficking and ways to detect and respond to signs of human trafficking. Effective training and education are the most important tools to prevent use of hotel facilities for sexual exploitation and human trafficking. If Defendant had exercised reasonable diligence in providing training, it would have prevented the Subject Hotel from being used to facilitate obvious and apparent sex trafficking, including the trafficking of Jane Doe (H.S.M.). By failing to take reasonable steps to provide appropriate training, despite the overwhelming evidence it had of an ongoing problem with use of the Subject Hotel for sex trafficking, Defendant negligently facilitated sex trafficking at the Subject Hotel.

62.    Beyond training, Defendant also retained control over the response of the Subject Hotel to human trafficking, including development of policies and procedures regarding detection of and response to human trafficking. By retaining control in this area, Defendant assumed a legal duty to the patrons and guests of the hotel. By failing to exercise reasonable diligence in discharge

16

of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (H.S.M.), at the Subject Hotel.

63.    At the heart of Defendant's venture with traffickers (including Jane Doe (H.S.M.)'s trafficker) is the reservation of hotel rooms. Upon information and belief, Defendant retained control over the details of reservations at the Subject Hotel, including controlling the online reservation system that was used, providing software systems that were used to check guests in and charge for rooms, controlling the prices of rooms, setting all details of the customer loyalty program that was implemented, and setting detailed policies for things such as payment methods and requirements to show identification. Because reservations and payments were processed through its systems, Defendant had access to guest and payment information. Defendant thus directly participated, through its acts and omissions, in reserving rooms to traffickers, including Jane Doe (H.S.M.)'s trafficker. If Defendant had used reasonable diligence in setting, implementing, and enforcing appropriate policies, it would have detected Jane Doe (H.S.M.)'s trafficking and/or prevented Jane Doe (H.S.M.)'s trafficker from using its hotel rooms to sexually exploit Jane Doe (H.S.M.). By failing to exercise reasonable diligence in discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (H.S.M.) at the Subject Hotel.

64.    Defendant retained the control to adopt and enforce policies on this subject for the Subject Hotel, but failed to adopt and enforce appropriate policies, which facilitated trafficking at the Subject Hotel and allowed Jane Doe (H.S.M.)'s trafficker to access rooms for the purpose of trafficking Jane Doe (H.S.M.).

65.    Defendant also retained control over issues related to reporting security and criminal activity, including human trafficking activity. On information and belief, Defendant

adopted a policy that required staff at the Subject Hotel to report indicators of potential criminal activity on premises to Defendant. Based on Defendant's retained control over this area, it knew or – with reasonable diligence in implementing and enforcing its own policies – should have known that Jane Doe (H.S.M.) was being trafficked. By failing to exercise reasonable diligence in discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (H.S.M.) at the Subject Hotel.

66.    On information and belief, Defendant also retained control over property-specific data and customer data from the Subject Hotel – which it obtained by controlling the means and methods by which hotel staff recorded, stored, and reported that data – such that it knew or should have known about the ongoing trafficking that was occurring at the Subject Hotel during the time Jane Doe (H.S.M.) was trafficked there. However, on information and belief, Defendant was willfully blind to this data and continued to facilitate trafficking at the Subject Hotel by providing a venue – and associated services – where traffickers could profit from sexual exploitation with minimal risk of disruption.

67.    Defendant also retained control over the security of the Subject Hotel through various means including, upon information and belief, placing and monitoring security cameras, accepting and reviewing customer complaints, and inspecting the Subject Hotel. It also collected data regarding hotel operations and customers, including names, payment information, reservation history, browsing data, and other details associated with their stay. Because Defendant retained this control, it had a duty to the patrons and visitors of the Subject Hotel. If Defendant had exercised reasonable care in the discharge of this duty, it would have detected and known about Jane Doe (H.S.M.)'s trafficking and avoided facilitating it. By failing to exercise reasonable

diligence in the discharge of this duty, Defendant facilitated sex trafficking, including the sex trafficking of Jane Doe (H.S.M.) at the Subject Hotel.

68.     Defendant also retained control over the safety and security of the experience at the Subject Hotel by setting up systems for customers to report issues to Defendant. Despite doing this, Defendant failed to act reasonably in response to complaints about criminal activity and sex trafficking at the Subject Hotel. If Defendant had acted reasonably and prudently in monitoring and responding to customer complaints, this would have reduced the rampant sex trafficking and would not have facilitated Jane Doe (H.S.M.)'s sex trafficking at the Subject Hotel.

69.     Defendant offered free internet service to guests at the Subject Hotel and retained control over the details of that internet service and policies regarding its use. Defendant knew or should have known that sex traffickers used its Wi-Fi and internet service to facilitate trafficking by advertising victims' commercial sex services. Defendant retained control over internet service and ultimately failed to enact policies to prevent Jane Doe (H.S.M.)'s trafficker from advertising commercial sex activity online and could have, with reasonable diligence, used tools to determine when the wi-fi at the Subject Hotel was being used to facilitate unlawful sexual exploitation.

70.     Based on public reporting, investigations, criminal incidents, hotel reviews and comments, and direct reporting from hotel staff and other employees of Defendant, as set out throughout this Complaint, Defendant had actual or constructive knowledge of pervasive sex trafficking the Subject Hotel. Defendant, through its acts and omissions, knowingly received financial benefits from activity at the Subject Hotel, that Defendant knew or should have known was unlawful sex trafficking.

71.    If Defendant had acted reasonably, in compliance with industry standards, and/or in compliance with its own policies and procedures, Jane Doe (H.S.M.)'s trafficking would have been prevented.

72.    In addition to Defendant's direct involvement in the venture through the means outlined above, Defendant also participated in the venture through the acts and omissions of the Subject Hotel's staff, which are Defendant's actual agents for the purpose of operating the Subject Hotel.

73.    Upon information and belief, Defendant exercised systemic and pervasive control over operation of the Subject Hotel, including the methods and details of the Subject Hotel's staff's work, through ways including:

    a.   Controlling and requiring use of a reservation and marketing system;

    b.   Controlling and requiring use of a credit card processing system;

    c.   Dictating policies regarding forms of payment;

    d.   Setting prices and imposing required discounts;

    e.   Setting wages;

    f.   Making or influencing employment decisions;

    g.   Requiring standardized training for hotel employees;

    h.   Requiring hotel staff to collect guest data using Defendant's systems, to compile reports, and to make that data available to Defendant; and

    i.   Requiring compliance with standards, policies, and rules adopted by Defendant on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel related policies published and communicated via property management systems, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Subject Hotel.

74.    Defendant did not merely identify quality or outcome standards. Instead, it specifically directed the means and methods that the staff at the Subject Hotel should use for day-to-day operations and dictated many of the core tools that were required to be used to conduct those operations, including the means and methods of operations that directly caused Jane Doe (H.S.M.)'s damages.

75.    Upon information and belief, Defendant had the right to and actually did enforce its control through various methods including:

   a.   Inspections of the Subject Hotel;

   b.   Monitoring or auditing for compliance with policies and expectations;

   c.   Directing to take specific steps to come into compliance with detailed and exacting standards;

   d.   Mandating training and education; and

   e.   The right to terminate.

76.    Defendant is vicariously liable for the acts and omissions of its agents and any sub-agents or employees with respect to operation of the Subject Hotel.

77.    In addition, Defendant participated in the venture through the acts and omissions of the staff at the Subject Hotel because Defendant employed the staff at the Subject Hotel.

78.    Upon information and belief, Defendant exercised control over the terms and conditions of employment by:

   a.   Posting jobs for the Subject Hotel;

   b.   Providing benefits to staff of the Subject Hotel;

   c.   Setting pay, pay parameters, or pay ranges for staff of the Subject Hotel;

   d.   Setting job qualifications;

   e.   Setting job descriptions;

21

    f.   Dictating staffing levels required at the Subject Hotel;

    g.   Making or influencing hiring decisions;

    h.   Providing onboarding and ongoing training; and

    i.   Maintaining employment records, including training records.

79.    Defendant acted as an employer because, at the Subject Hotel, there is a high degree of interrelation of operations and profit sharing.

80.    In ways described more fully above, Defendant knowingly received a financial benefit from participating in a venture with what it knew or should have known was sex traffickers, including Jane Doe (H.S.M.)'s sex trafficker, as follows:

    a.   Sex traffickers, including Jane Doe (H.S.M.)'s sex trafficker, frequently used the Subject Hotel for their trafficking because they knew that staff members would look the other way. This occurred because Defendant had (1) failed to adopt and enact policies to effectively detect sex trafficking and stop use of its facilities to facilitate that trafficking; (2) failed to use reasonable care when hiring, retaining, supervising, and training staff at the Subject Hotel; and (3) affirmatively adopted policies and procedures that allowed sex trafficking to flourish.

    b.   Defendant participated in the venture by renting rooms to Jane Doe (H.S.M.)'s traffickers long after it knew or should have known that Jane Doe (H.S.M.) was being subjected to unlawful trafficking.

    c.   Defendant knowingly benefited from acquiring valuable customer data when it provided free Wi-Fi to patrons at the Subject Hotel. Defendant profited from data collected each and every time Jane Doe (H.S.M.)'s trafficker and buyers used its free Wi-Fi to advertise and solicit Jane Doe (H.S.M.) for commercial sex at the Subject Hotel.

    d.   Defendant controlled policies and procedures relating to Wi-Fi, information technology, and the collection of guest web browsing data at the Subject Hotel. Defendant required the Subject Hotel to use specific Wi-Fi service providers and to store its guest data on Defendant's centralized data platforms. Defendant had direct access to guest data through its centralized management platforms. Defendant then used this valuable guest data for marketing purposes and also retained data to sell to third parties.

    e.   Defendant knowingly benefited from allowing the ongoing use of its Wi-Fi to access websites like Backpage and other notorious sites used for the advertisement

of commercial sex, knowing that if it cut off access to such pages, it would lose traffickers' and buyers' regular and profitable patronage.

f. Defendant not only provided these traffickers with a physical space but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit understanding with traffickers, which is evidenced by, among other things:

    i. Jane Doe (H.S.M.)'s traffickers were familiar to the staff at the Subject Hotel;

    ii. Jane Doe (H.S.M.)'s traffickers took no steps to conceal their activities from the staff at the Subject Hotel but, instead, freely made requests that would facilitate his trafficking activities without concern for detection or interference by that staff;

    iii. Defendant participated in this venture by providing additional services to traffickers (including Jane Doe (H.S.M.)'s traffickers), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms; and

    iv. Defendant's venture with traffickers resulted in revenue from room rentals and other incidental purchases by traffickers, including Jane Doe (H.S.M.)'s trafficker, which accrued to the benefit of Defendant. Each room rented at the Subject Hotel increased revenue for Defendant.

81. Under the TVPRA, Defendant is liable for all damages a jury awards to Jane Doe (H.S.M.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the Subject Hotel.

## CAUSE OF ACTION – CIVIL SEX TRAFFICKING UNDER THE TVPRA

### I. Beneficiary Liability Under 18 U.S.C. § 1595(a).

82. Jane Doe (H.S.M.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) in that her traffickers recruited, harbored, maintained, and provided her, knowing or in reckless disregard of the fact that force, threats of force, fraud, or coercion would be used to cause her to engage in commercial sex acts. She is therefore entitled to bring a civil action under 18 U.S.C. § 1595(a).

83.     Through acts and omissions described in this Complaint, Defendant knowingly benefited, financially and by receiving things of value, from participation in a venture with sex traffickers, including Jane Doe (H.S.M.)'s traffickers, which venture Defendant knew or should have known had engaged in acts in violation of 18 U.S.C. § 1591(a)(1) and/or 18 U.S.C. § 1591(a)(2). Defendant is therefore liable to Jane Doe (H.S.M.) as a beneficiary under 18 U.S.C. § 1595(a).

84.     Defendant's liability as a beneficiary under 18 U.S.C. § 1595(a), together with the other unlawful acts and omissions alleged in this Complaint, directly and proximately caused Jane Doe (H.S.M.) to suffer substantial physical and psychological injuries and other damages as a result of being trafficked and sexually exploited at the Subject Hotel.

## TOLLING OF LIMITATIONS

85.     To the extent Defendant asserts an affirmative defense of limitations, Jane Doe (H.S.M.) invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendant at the Subject Hotel.

86.     To the extent Defendant asserts an affirmative defense of limitations, Jane Doe (H.S.M.) also invokes the doctrine of equitable tolling. As a victim of sex trafficking and a vulnerable victim with a legally recognized mental disability, she faced extraordinary circumstances, arising through no fault of her own, that prevented her from filing this lawsuit, and those circumstances did not end more than ten years before she filed this action.

87.     While under the control of her traffickers through at least March 21, 2017, Jane Doe (H.S.M.) did not have the freedom or functional capacity to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Because of

her mental disability and her traffickers' control, she could not have pursued her claims despite the exercise of ordinary diligence.

88.     While under the control of her traffickers, Jane Doe (H.S.M.) was subjected to extreme psychological manipulation, coercion, and violence that compounded her pre-existing mental disability and produced lasting effects on her mental capacity that persisted throughout and well beyond the time she was actively trafficked. She did not want to engage in commercial sex acts, but felt as if she had no choice but to comply with her traffickers' demands. As a result of these effects, she could not – through the exercise of ordinary diligence – recognize, discover, and pursue her legal rights at an earlier time.

89.     Jane Doe (H.S.M.) was subjected to continuous trafficking at the Subject Hotel through at least March 21, 2017, which is not more than 10 years before she filed this lawsuit.

90.     This trafficking resulted from Defendant's facilitation of trafficking at the Subject Hotel and Defendant's ongoing venture with criminal traffickers. Defendant's continuous wrongful conduct, together with Jane Doe (H.S.M.)'s mental disability and trafficking-induced impairments, therefore tolls any limitations period that Defendant may assert.

## DAMAGES

91.     Defendant's acts and omissions, individually and collectively, caused Jane Doe (H.S.M.) to sustain legal damages.

92.     Defendant is liable for all past and future damages sustained by Jane Doe (H.S.M.).

93.     Jane Doe (H.S.M.) is entitled to be compensated for personal injuries and economic damages, including:

   a.   Actual damages (past and future);

   b.   Incidental and consequential damages (past and future);

    c.   Mental anguish and emotional distress damages (past and future);

    d.   Lost earnings and earning capacity;

    e.   Necessary medical expenses (past and future);

    f.   Life-care expenses;

    g.   Physical pain and suffering (past and future);

    h.   Physical impairment (past and future);

    i.   Emotional impairment (past and future);

    j.   Exemplary/punitive damages;

    k.   Attorneys' fees;

    l.   Costs of suit; and

    m.  Prejudgment and postjudgment interest; and

    n.   All other relief recoverable.

## **JURY DEMAND**

94.    Jane Doe (H.S.M.) demands a jury trial on all issues.

## **REQUEST FOR RELIEF**

WHEREFORE, Jane Doe (H.S.M.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (H.S.M.) against Defendant for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, postjudgment interest, and such other and further relief to which Jane Doe (H.S.M.) may, in law or in equity, show herself to be justly entitled.

Dated:  February 23, 2026

Respectfully submitted,

ANNIE MCADAMS PC

*/s/ Annie McAdams*
Annie McAdams, Esq.
2900 North Loop West, Suite 1130
Houston, Texas 77092
(713) 785-6262
(866) 713-6141 Facsimile
*annie@mcadamspc.com*
*service@mcadamspc.com*

**LEAD COUNSEL FOR PLAINTIFF**

-and-

SICO HOELSCHER HARRIS, LLP
David E. Harris, Esq.
Ramsey S. Al-Azem, Esq.
819 N. Upper Broadway
Corpus Christi, Texas 78401
(361) 653-3300
(361) 653-3333 Facsimile
*dharris@shhlaw.com*
*ralazem@shhlaw.com*

**ADDITIONAL COUNSEL FOR PLAINTIFF**